| UNITED STATES DISTRICT COURT | **NOT FOR PUBLICATION** |
|---|---|
| EASTERN DISTRICT OF NEW YORK | |

SAMUEL MALDONADO,

                Petitioner,

– against –    **MEMORANDUM & ORDER**

WARDEN, ADIRONDACK CORRECTIONAL    17-CV-6368 (ERK)
FACILITY, et al.,

                Respondents.

KORMAN, *J.*:

## BACKGROUND

Petitioner Samuel Maldonado's daughter accused him of raping her in February of 2010. Pet'r's App'x at A1, ECF No. 30-1; Resps.' App'x, Ex. A, at 10, ECF No. 7-1. Maldonado denied the accusation, asserting that his daughter was lying to get back at him following an earlier disagreement. Pet'r's App'x at A13, A24-25. He was ultimately charged with various offenses, including first- and second-degree rape, sexual abuse, incest, and sexual misconduct. Schulman Aff. ¶ 5, ECF No. 7. On June 23, 2011, Maldonado received a plea offer: ten years' imprisonment and ten years of post-release supervision. Pet'r's App'x at A4.

Plea negotiations continued until November 30, 2011, when Maldonado's counsel informed New York State Supreme Court Justice Elizabeth Foley that he and the prosecutor were "close to a disposition" "[f]ar below" the initial offer of ten years. *Id.* at A35-36. Ultimately, the prosecutor was "willing to come down to five years." *Id.* at A37. Maldonado indicated that he was hoping to get four years, but Justice Foley explained that such a sentence was impossible given the charges and his criminal history, and the prosecutor confirmed this assessment. *Id.* at A37-38. Maldonado's counsel similarly stated, "[W]e were discussing something quite a bit lower," but

Justice Foley noted that she would "not go[] lower than five." *Id.* at A38. Maldonado declined to take the plea, even knowing it would "not be re-offered." *Id.* at A39.

Nevertheless, the very next day, Maldonado "request[ed] leave . . . to withdraw his previously-entered plea of not guilty and to enter a plea of guilty," which "would cover all counts in the indictment." *Id.* at A43. The prosecutor stated the offer on the record: "[A] plea to the third count of the indictment, Sexual Abuse in the First Degree, five years jail, *plus fifteen years post-release supervision*." *Id.* at A44 (emphasis added). Justice Foley proceeded to ask Maldonado a series of questions to confirm that he understood the proceedings and the implications of his plea. *Id.* at A44-46. During this colloquy, she reiterated that "the promised sentence you'll receive is five years in jail, *plus fifteen years post-release supervision*." *Id.* at A46 (emphasis added). She also began to explain that Maldonado "will also be subject to a S.O.R.A." *Id.* Before she could provide any details, Maldonado cut her off and said "Registered Sex Offender Act. I'm aware of that." *Id.* Justice Foley proceeded to explain the possibility of civil confinement, and Maldonado asked both her and his counsel about the implications of civil confinement. *See id.* at A46-48. After addressing his concerns, Justice Foley confirmed that Maldonado had "a complete understanding of what [he's] pleading guilty to here." *Id.* at A48-49. Maldonado continued to express misgivings about civil confinement, but Justice Foley ultimately accepted his plea. *See id.* at A49-53.

During a subsequent interview with the Probation Department, Maldonado "did not accept responsibility for the offense," explaining that he "pled guilty because he could not get a fair trial." PSR at 3, ECF No. 31-3. Just two days after entering a guilty plea, Maldonado filed a *pro se* motion to withdraw it, asserting that he "did not know what post-release [supervision] was," that the term "was never talked about or agreed upon," and that his "attorney never explained the components of post-release supervision nor did the court." Pet'r's App'x at A54-56.

Five days after Maldonado filed his motion, his attorney filed the following letter:

> There were many conversations as to the terms of the plea . . . . Length of sentence, particular count: violent or non-violent, SORA and allocution were thoroughly discussed. . . . During the final conversation with defendant in the pens on 12/1/11 . . . there was little discussion as to post release supervision. I told the defendant that he would likely[] get 5 years. We did not at that time or ever discuss the 5 to 15 year range allowed by [statute] . . . for his particular situation. The post release time was never negotiated in any plea conference . . . . Mr. Maldonado had no time to reflect on this added encumbrance and called me about it that very same day.

*Id.* at A57-58.

One week later, Maldonado appeared in court seeking to withdraw his plea. *Id.* at A61-62. His attorney confirmed that "there [was] a miscommunication with regard to the supervisory release" and explained that he "told [Maldonado] [fifteen years of supervised release] was a possibility . . . I didn't tell him that he would get that." *Id.* at A62, A67. He went on to say that he thought Maldonado "was taken by surprise" by the fifteen-year term. *Id.* at A68. Maldonado added, "I didn't even know what post-release supervision is . . . [I have] [n]ever been on parole . . . [nor] been upstate." *Id.*

On December 21, 2011, Maldonado returned to court for sentencing. Justice Foley stated that both she and the prosecutor had mentioned the fifteen-year term of supervised release at the plea hearing, concluding that Maldonado received proper notice. *Id.* at A78-79. In his final remarks before sentencing, Maldonado insisted that he pleaded guilty because he could not "get a fair trial" and that he "at no time whatsoever . . . rape[d] [his] daughter." *Id.* at A80. He also explained that, in deciding to plead guilty, he was "thinking about [his] wife and kids," because he is "the one that provides for [his] wife and children," and weighed the risk of "go[ing] to trial and . . . los[ing]" and facing a twenty-five-year sentence against "tak[ing] five years." *Id.* at A80-81. Maldonado was ultimately sentenced in accordance with the plea: "five years in jail plus 15 years post release supervision." *Id.* at A82.

3

Maldonado appealed, challenging the denial of his motion to withdraw his plea and the effectiveness of his counsel. The Appellate Division affirmed, holding that Maldonado's "plea was entered knowingly, voluntarily, and intelligently" and that his "contention that he was deprived of the effective assistance of counsel is without merit." *People v. Maldonado*, 39 N.Y.S.3d 826, 826 (App. Div. 2016). The Court of Appeals denied leave to appeal. *People v. Maldonado*, 28 N.Y.3d 1186 (2017). Maldonado filed a *pro se* petition for a writ of habeas corpus under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. *See* Pet., ECF No. 1. I granted Maldonado's motion to appoint counsel. Maldonado raises two distinct but interrelated claims: that counsel was ineffective for failing to explain the terms of his post-release supervision and that his due process rights were violated because the state judge failed to explain those terms. I will address each separately.

## DISCUSSION

An individual in state custody may obtain a writ of habeas corpus if the state court's "adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

> In order for a state court's decision to be an unreasonable application of [the Supreme] Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice. In other words, a litigant must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. This is meant to be a difficult standard to meet.

*Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (per curiam) (citations and quotation marks omitted).

4

## I. The Appellate Division Reasonably Applied *Strickland*

Defendants have a right to the assistance of competent counsel during the plea process. *See Hill v. Lockhart*, 474 U.S. 52, 56-58 (1985); *see also Missouri v. Frye*, 566 U.S. 134, 140 (2012). In evaluating whether counsel rendered effective assistance in relation to a plea, the familiar two-part test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984), applies. *See Lafler v. Cooper*, 566 U.S. 156, 173-74 (2012). To prevail on an ineffective assistance claim, Maldonado must first establish that "counsel's performance was deficient," meaning "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In the context of plea bargaining, failure to inform a client of "the advantages and disadvantages of a plea agreement," *Libretti v. United States*, 516 U.S. 29, 50-51 (1995), including major consequences of pleading guilty, amounts to deficient performance. *See Padilla v. Kentucky*, 559 U.S. 356, 364-68 (2010). Second, Maldonado must demonstrate "that the deficient performance prejudiced the defense" by showing that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687, 694. Here, a different outcome means rejecting the plea offer. *See Hill*, 474 U.S. at 59. Failure on either prong dooms a claim of ineffective assistance. *See Strickland*, 466 U.S. at 697. "[T]he question [on collateral review] is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105; *see also Gueits v. Kirkpatrick*, 612 F.3d 118, 125 (2d Cir. 2010) ("Our task is limited to assessing whether the Appellate Division unreasonably applied *Strickland* . . . .").

Counsel's failure to inform Maldonado regarding the actual term of post-release supervision he faced and other consequences of his plea patently amounted to deficient performance. Professional norms require attorneys to discuss the range of penalties, including

5

post-release supervision and related conditions, that a defendant may face. *See, e.g.*, Gabriel J. Chin & Richard W. Holmes Jr., *Effective Assistance of Counsel and the Consequences of Guilty Pleas*, 87 Cornell L. Rev. 697, 716 & n.193 (2002) (collecting sources indicating that clients should be advised of parole or probation consequences before pleading); *see also Libretti*, 516 U.S. at 50-51 (1995) ("[I]t is the responsibility of defense counsel to inform a defendant of the advantages and disadvantages of a plea agreement."). This is particularly true given the comprehensive regime for sex offenders after their release from prison. *See, e.g.*, N.Y. Correct. Law § 168-f (requiring convicted sex offenders to register with the State, regularly appear before local law enforcement to have photographs taken, and provide updates of "any change of address, internet accounts with internet access providers belonging to such offender, internet identifiers that such offender uses, or his or her status of enrollment, attendance, employment or residence at any institution of higher education"); N.Y. Exec. Law § 259-c(14) (imposing "as a mandatory condition of [parole or conditional release]" a prohibition on "knowingly entering into or upon any school grounds . . . or any other facility or institution primarily used for the care or treatment of persons under the age of eighteen while one or more of such persons under the age of eighteen are present"); *In re Williams v. Dep't of Corr. & Cmty. Supervision*, 24 N.Y.S.3d 18, 20 (App. Div. 2016) (noting that the law imposes a "mandatory condition[] that restrict[s] both the location of [a sex offender's] residency and his knowing travel to no closer than 1000 feet of school grounds"). Maldonado's attorney admits that he did not fully apprise Maldonado about the nature of his post-release supervision. Pet'r's App'x at A57-58. Thus, his performance was deficient.

Turning to the prejudice prong, Maldonado must demonstrate "that there is a reasonable probability that," had he been fully advised of the fifteen-year term of supervised release, "he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. To

establish such a probability, Maldonado may not rely solely on the assertions in his habeas petition. Rather, he must put forth "objective evidence" that he would have rejected the plea. *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003); *see also Lee v. United States*, 137 S. Ct. 1958, 1967 (2017) ("Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences.").

Some facts weigh against a finding of prejudice here. For instance, Maldonado secured a favorable plea deal—five years in prison, as opposed to the ten years initially offered and the twenty-five years he could have faced if convicted after trial. *Cf. United States v. Arteca*, 411 F.3d 315, 319, 321 (2d Cir. 2005) (noting that obtaining a substantially lesser sentence of 72 months suggests that there is not a reasonable probability defendant would have rejected a plea offer even though he did not know that the sentencing range was 151-188 months). Maldonado admitted that his desire to be with and provide for his family informed his decision to take a five-year plea over risking a twenty-five-year sentence following trial, Pet'r's App'x at A80-81, and supervised release would not have implicated that concern.

But while Maldonado's plea agreement secured him a lower sentence, it is unclear whether he would have been convicted at trial, weighing in favor of a finding of prejudice. Even putting aside Maldonado's protestations of innocence, his daughter—the victim of the alleged rape—appears to have recanted her accusations. *See* Pet'r's App'x at A161-67. This is not a situation where Maldonado faced an all-but-guaranteed conviction; he may have gone to trial if he more fully understood the consequences of his plea. *Cf. Arteca*, 411 F.3d at 321 (considering strength of government's case in evaluating favorability of plea agreement); *Gomez v. United States*, 2013 WL 66080, at *7 (E.D.N.Y. Jan. 4, 2013) (where "overwhelming evidence support[ed] [a] conviction,"

7

defendant must offer evidence "that he would have rationally chosen to take the risk of a harsher sentence rather than accept the plea").

Moreover, two days after pleading guilty, Maldonado moved to withdraw his plea. *See id.* at A54-56; *see Oyague v. Artuz*, 274 F. Supp. 2d 251, 260 (E.D.N.Y. 2003) (motion to withdraw plea indicative of prejudice); *cf. Wilens v. Superintendent of Clinton Corr. Fac.*, 2014 WL 28995, at *13 (E.D.N.Y. Dec. 31, 2013) (prejudice not shown where petitioner did not attempt to withdraw his guilty plea). In his motion to withdraw, Maldonado specifically noted that he "did not know what post-release was" and that neither his attorney nor the judge explained it to him. Pet'r's App'x at A55-56. When Maldonado appeared in court after filing that motion, he told Justice Foley that he "didn't even know what post-release supervision is" because he had never been on parole and had never been "upstate," *i.e.*, incarcerated in an upstate prison. *Id.* at A68. His attorney confirmed that "[Maldonado] was taken by surprise" at the fifteen-year term. *Id.* at A67-68.

Ultimately, though, these assertions are belied by the record. Maldonado confirmed at a subsequent hearing that he "did get notice that . . . the sentence was 15 years post release supervision." Pet'r's App'x at A79. "[E]ven if his trial counsel did not apprise him of his basic rights and the risks in pleading guilty, [Maldonado] cannot prove prejudice because he was so informed by [the state court] at the plea hearing." *Wang v. United States*, 2011 WL 73327, at *5 (E.D.N.Y. Jan. 10, 2011). Moreover, Maldonado was alert and engaged throughout the plea colloquy. When Justice Foley began to explain what "SORA" meant, Maldonado cut her off, and said "Registered Sex Offender Act. I'm aware of that." Pet'r's App'x at A46. Just a moment later, when Justice Foley asked if Maldonado understood what it meant to "be eligible for the civil confinement statute in New York state," Maldonado replied, "No, I didn't understand that part. That's what I was trying to find out," and proceeded to ask about civil commitment. *Id.* at A46-47.

8

It appears that Maldonado would have inquired about post-release supervision if he were genuinely confused about it.

On this record, the Appellate Division reasonably applied *Strickland*. *See Gueits*, 612 F.3d at 125. The ultimate question on habeas review "is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105. Here, there is a reasonable argument that Maldonado was not prejudiced: His attentiveness during the plea colloquy coupled with his failure to inquire about the supervised release term when he was told about it supports the conclusion that that he would still have accepted the favorable plea offer even if he was more fully informed. The substantial deference accorded to state courts on habeas review requires rejection of Maldonado's ineffective assistance claim.

**II. The Appellate Division Reasonably Concluded That Maldonado's Plea Was Intelligent and Voluntary**

A guilty plea is valid if it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). Because a guilty plea waives various rights, it "must be [a] knowing, intelligent act[] done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970); *see also Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005). "A plea of guilty is considered voluntary and intelligent if the defendant enters the plea with full awareness of its 'direct consequences.'" *Wilson v. McGinnis*, 413 F.3d 196, 199 (2d Cir. 2005) (quoting *Brady*, 397 U.S. at 755); *see also Bousley v. United States*, 523 U.S. 614, 619 (1998). "Direct consequences" are "those that have a 'definite, immediate and largely automatic effect on the range of the defendant's punishment.'" *United States v. Youngs*, 687 F.3d 56, 60 (2d Cir. 2012) (quoting *Wilson*, 413 F.3d at 199).

9

Maldonado's due process claim rests on the premise that his guilty plea was not voluntary and intelligent because the state judge failed to apprise him "what 15 years of post-release supervision meant" and "totally failed to explain the breadth of special restrictions that [he] would face as [a] convicted sex offender." Supp. Br. 24, ECF No. 30. This argument presumes that post-release supervision and other post-release restrictions imposed on sex offenders qualify as "direct consequences" of a conviction. Under New York State law, that is true. *See People v. Catu*, 4 N.Y.3d 242, 245 (2005), *superseded by statute on other grounds as stated in People v. Estremera*, 30 N.Y.3d 268, 270 (2017). But habeas review focuses on "unreasonable application[s] of[] clearly established *Federal* law." 28 U.S.C. § 2254(d)(1) (emphasis added).

Numerous courts have held that "because the Supreme Court has never held that a mandatory term of post-release supervision is a direct consequence of a criminal conviction, a court's failure to inform a defendant of such a term cannot be a violation of clearly established Federal law." *Facen v. Cully*, 787 F. Supp. 2d 278, 284-85 (W.D.N.Y. 2011) (collecting cases); *see, e.g.*, *Lockhart v. Chandler*, 446 F.3d 721, 724 (7th Cir. 2006); *Monk v. Racette*, 2017 WL 2984129, at *5 (S.D.N.Y. July 12, 2017) (collecting cases). *But see McBride v. Perez*, 2015 WL 5231509, at *3 (S.D.N.Y. Sept. 8, 2015) ("[T]he petition should not be denied here due to the absence of a Supreme Court determination that post-release supervision is a 'direct consequence' of a plea."). The Second Circuit, in a pair of unpublished summary orders, has similarly recognized that "the Supreme Court has not considered the issue of whether a trial court's failure to inform a defendant of a mandatory term of supervised release makes the subsequent plea involuntary," and has even "expressly reserved [a] very similar question." *Bonner v. Ercole*, 338 F. App'x 61, 62 (2d Cir. 2009) (citing *Lane v. Williams*, 455 U.S. 624, 625 (1982)); *Pignataro v. Poole*, 381 F. App'x 46, 49-50 (2d Cir. 2010) ("[I]n the absence of a Supreme Court ruling on the issue of whether PRS (or

a similar state-imposed post-imprisonment term of supervision, such as parole) could be a direct consequence of a guilty plea, the trial court's acceptance of Appellant's guilty plea was not contrary to or an unreasonable application of federal law.").

The holdings of the cases cited above are troubling. They appear to be predicated on a flawed understanding of what it means for precedent to be "clearly established" and what qualifies as a "direct consequence." AEDPA provides that "a writ of habeas corpus . . . shall not be granted . . . unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision 'involv[ing] an unreasonable application of . . . clearly established Federal law.'" *See Williams v. Taylor*, 529 U.S. 362, 407-08 (2000) (O'Connor, J., for a majority).

While "[t]he term 'unreasonable' is no doubt difficult to define," *id.* at 410, the Court has offered some guidance. Declining to apply a "general standard" when it should apply to a "set of facts 'different from those of the case in which the principle was announced,'" constitutes an "unreasonable application" of federal law. *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)). Moreover, "AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.'" *Panetti*, 551 U.S. at 953 (quoting *Carey v. Musladin*, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring)). Put differently, general standards may constitute "clearly established" precedent. *Id.* Admittedly, "[t]he more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). But where a general rule is clearly established, state court decisions must fit "within the matrix of [the Court's]

11

prior decisions," *id.* at 665, or "within the scope" of the general principle, even if "the precise contours . . . are unclear," *Lockyer*, 538 U.S. at 76 (quotation marks omitted). "'The fact that the Supreme Court has never expressly extended' a legal rule to a particular factual context 'does not foreclose analysis' under Section 2254(d)(1)'s 'unreasonable application' prong." *McBride*, 2015 WL 5231509, at *2 ((quoting *Grayton v. Ercole*, 691 F.3d 165, 170 (2d Cir. 2012)).

Returning to Maldonado's claim, the Supreme Court has flirted with the question of whether information regarding supervised release must be provided for a waiver to be voluntary and intelligent but has never directly addressed it. *See Lane*, 455 U.S. at 625 ("We granted certiorari to consider whether the failure of the trial court to advise respondents of that mandatory parole requirement before accepting their guilty pleas deprived them of due process of law. We are unable to reach that question, however, because we find that respondents' claims for relief are moot."); *see also Hill*, 474 U.S. at 56 ("We have never held that the United States Constitution requires the State to furnish a defendant with information about parole eligibility in order for the defendant's plea of guilty to be voluntary, and indeed such a constitutional requirement would be inconsistent with the current rules of procedure governing the entry of guilty pleas in the federal courts."). *But see* Fed. R. Crim. P. 11(b)(1)(H) (amended after *Hill* to require courts to "inform the defendant of, and determine that the defendant understands, . . . [any] term of supervised release"). Many courts have taken this lack of a definitive ruling to mean that a petitioner arguing that he "must be advised of a term of [supervised released] at the time he attempts to enter a plea of guilty" "faces an impossible hurdle in showing the state court . . . unreasonably applied[] clearly established federal law as determined by the Supreme Court because the Court has expressly declined to decide the issue. As a result, there can be no Supreme Court precedent to . . . unreasonably appl[y]." *Lockhart*, 446 F.3d at 724 (citation omitted).

Yet the Supreme Court has established that a defendant must be made aware of a plea's direct consequences. *See Brady*, 397 U.S. at 755; *see also Bousley*, 523 U.S. at 619. Thus, the relevant inquiry is whether post-release supervision and other mandatory conditions of release qualify as direct consequences. Given the lack of clear guidance on this question from the Court, state courts receive more leeway in their answers. *See Yarborough*, 541 U.S. at 664. But federal courts cannot abrogate their responsibility to evaluate the issue merely because the Supreme Court has not spoken with extraordinary precision.

Guilty pleas invariably have certain "definite, immediate and largely automatic effect[s]" of which a defendant must be made aware. *See Youngs*, 687 F.3d at 60. A mandatory term of supervised release imposed as part of a defendant's sentence is such a consequence, as the New York Court of Appeals has held, *see Catu*, 4 N.Y.3d at 245, and the Second Circuit has suggested, *United States v. Blackburn*, 461 F.3d 259, 265 n.5 (2d Cir. 2006) ("[H]is term of supervised release (a direct consequence of his conviction) would be reduced . . . ."); *id.* at 269 (Sotomayor, J., dissenting) ("[Defendant's] supervised-release term is a direct consequence of his conviction."). Supervised release bears many similarities to incarceration, which indisputably qualifies as a direct consequence of conviction. *Cf. United States v. Tarbell*, 728 F.3d 122, 127 (2d Cir. 2013) (noting that "a ten-year mandatory minimum term of imprisonment" is a "direct consequence" of a guilty plea). The Supreme Court has repeatedly recognized that "[p]robation, like incarceration, is a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty," *e.g., Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (quotation marks omitted), and that an individual on parole or probation is "in custody," like an individual in prison, *see Jones v. Cunningham*, 371 U.S. 236, 240-43 (1963). The Second Circuit has similarly held that supervised release—specifically, the supervised release mandated by New York law—is a portion of the

13

sentence that must be imposed by a judge, just like incarceration. *See Earley v. Murray*, 451 F.3d 71, 75-76 (2d Cir. 2006).

To hold that mandatory supervised release is not a direct consequence of a plea or conviction would render the phrase "direct consequence" all but meaningless. In this context, I see no principled distinction between a carceral sentence and mandatory supervised release. While the Second Circuit, in a non-precedential summary order, has suggested that the mere fact that supervised release may be "modified" renders it a collateral consequence, *see Pignataro*, 381 F. App'x at 49, the possibility of modification does not render supervised release indefinite or non-automatic. Defendants may be resentenced, *see, e.g.*, 18 U.S.C. § 3582(c), but failure to inform a defendant of the possibility of imprisonment prior to accepting his plea is patently a due process violation. While the Supreme Court has never specifically held that mandatory supervised release qualifies as a direct consequence of conviction, any mandatory component of a sentence falls "within the matrix" of direct consequences. *Id.* at 665-666 ("Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt."). In sum, I agree with Judge Briccetti's analysis in *McBride*: "[T]he petition here should not be denied due to the absence of a Supreme Court determination that post-release supervision is a 'direct consequence' of a plea." 2015 WL 5231509, at *2.

Nevertheless, even though Maldonado had to be fully informed of the nature of his post-release supervision, "a fairminded jurist could conclude" that he was. *See McBride*, 2015 WL 5231509, at *3; *see also Harrington*, 562 U.S. at 101 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." (quotation marks and citation omitted)). Justice Foley and the prosecutor both mentioned that Maldonado would face fifteen years of supervised release.

14

Pet'r's App'x at A44, A46. Maldonado's attorney referenced a term of supervised release during their conversations, even if he misstated its likely length. *See id.* at A57. Notwithstanding his subsequent attempt to withdraw his plea, Maldonado's consistent engagement during the colloquy regarding other consequences alongside his failure to inquire specifically about supervised release suggests that additional information would not have altered his calculus, as post-release supervision did not concern him during the colloquy. *See McBride*, 2015 WL 5231509, at *3 (habeas relief denied where "[p]ost-release supervision was mentioned twice at petitioner's plea proceeding, during which he appears to have been active and alert"). Indeed, the terms "supervised release" and "post-release supervision" are essentially self-defining, so it is unclear what additional information Maldonado would like to receive. He waved off Justice Foley's attempts to explain SORA, one of the other restrictions imposed on sex offenders. And Justice Foley confirmed that Maldonado understood what he was pleading to before accepting his plea. *See* Pet'r's App'x at A48-53; *see McBride*, 2015 WL 5231509, at *3 ("Petitioner also affirmed at the end of his allocution he understood 'everything that's been said here today.'"). Maldonado suffered no prejudice and relief is unwarranted.

Finally, Maldonado argues that Justice Foley's failure to explain the full panoply of mandatory restrictions imposed by New York law on sex offenders, such as SORA, SOMTA, and SARA, amounts to a due process violation. Putting aside Maldonado's own curtailment of Justice Foley's description of SORA, this argument has some force: The mandatory restrictions imposed on offenders post-release qualify as direct consequences of a guilty plea much like mandatory supervision. Indeed, due to the onerous nature of such restrictions, when similar "special conditions" are imposed by federal judges, this Circuit generally requires that judges "expressly explain [their] reason(s) for exacting a particular special condition" on the record, unless "the

15

supporting reasons are evident on the overall record." *United States v. Balon*, 384 F.3d 38, 41 n.1 (2d Cir. 2004) (quoting *United States v. Kingsley*, 241 F.3d 828, 836 (6th Cir. 2001)); *see also United States v. Betts*, 886 F.3d 198, 202 (2d Cir. 2018) ("A district court is required to make an individualized assessment when determining whether to impose a special condition of supervised release, and to state on the record the reason for imposing it . . . ."). Nevertheless, I do not reach this argument because Maldonado failed to exhaust it. *See* 28 U.S.C. § 2254(b)(1)(A). To exhaust a claim, "[t]he state court must be fairly apprised . . . of the factual and legal premises underlying the claim." *Grey v. Hoke*, 933 F.2d 117, 119 (2d Cir. 1991). Maldonado's state court appellate brief does not specifically reference any of the conditions imposed upon him as a sex offender under New York law. His brief solely discussed the length of the supervised release term. Maldonado's passing references to "the ramifications of pleading guilty," *see, e.g.*, ECF No. 7-1, at 117 (Ex. H, Pet'r's State Appellate Br.), are insufficient. Indeed, if he were to raise such a claim in a motion to vacate under New York's Criminal Procedure Law § 440.10, such a motion would likely be denied as procedurally forfeited. *See* N.Y. Crim. Proc. Law § 440.10(2)(c) ("[T]he court must deny a motion to vacate a judgment when . . . no such appellate review or determination occurred owing to the defendant's . . . unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him.").

### III. Maldonado's Innocence Claim Is Not Cognizable on Collateral Review

Maldonado also alleges that he is innocent of any sexual misconduct. While New York recognizes a right to pursue actual innocence claims if a defendant is convicted following trial, the Court of Appeals recently held that no such right exists if a defendant pleads guilty, *see People v. Tiger*, 32 N.Y.3d 91, 99 (2018), excusing Maldonado's failure to exhaust this claim. 28 U.S.C. § 2254(b)(1)(B). Nevertheless, "[w]hether . . . a federal right" "to be released upon proof of 'actual

16

innocence'" exists remains "an open question." *Dist. Atty.'s Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 71 (2009). The Supreme Court has noted that:

> Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding. . . . This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact.

*Herrera v. Collins*, 506 U.S. 390, 400 (1993). There is no clearly established right to habeas relief upon a showing of actual innocence and no standard, general or otherwise, that applies to such claims. *Friedman v. Rehal*, 618 F.3d 142, 159 (2d Cir. 2010).

## CONCLUSION

The petition is denied. I grant a certificate of appealability as to Maldonado's ineffective assistance of counsel and due process claims.

**SO ORDERED.**

*Edward R. Korman*

Brooklyn, New York
July 23, 2019

Edward R. Korman
United States District Judge